## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

JANET DE AMAT,

    Plaintiff,

v.

UNITED NATURAL FOODS, INC., and
SUPERVALU INC.,

    Defendants.

Civil No. 21-2323-BAH

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## <u>MEMORANDUM OPINION</u>

Plaintiff Janet De Amat brought suit against her former employers, United Natural Foods, Inc. ("UNFI"), and SuperValu, Inc. ("SuperValu," and, collectively, "Defendants"), alleging discrimination in violation of Title VII of the Civil Rights Act of 1991, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"); the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* (the "ADA"); and 42. U.S.C. § 1981.  ECF 22.  Pending before the Court is Defendants' motion for summary judgment.  ECF 86.  Plaintiff filed an opposition, ECF 91, and Defendants filed a reply, ECF 94. All filings include memoranda of law and exhibits.[1]  The Court has reviewed all relevant filings and finds that no hearing is necessary.  *See* Loc. R. 105.6 (D. Md. 2023).  Accordingly, for the reasons stated below, Defendant's motion for summary judgment, ECF 86, is **GRANTED**.

## I.    <u>BACKGROUND</u>

Defendants jointly own and operate several grocery stores, including the Shoppers' Food Warehouse ("Shoppers") in Germantown, Maryland.  ECF 86-2, at 1 ¶ 1 (Joint Statement of

---

[1] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page.

Undisputed Facts); *see also* ECF 86-1, at 9 (referring to Defendants jointly as "UNFI"). Plaintiff began working at the Germantown Shoppers in 1997 and worked there for more than 20 years, until the events that gave rise to this case. ECF 86-2, at 1–2 ¶¶ 1–6. Plaintiff was employed by both Defendants when for the duration of the time she worked at Shoppers. *Id.* at 1 ¶ 1.

The events underlying this case began in 2016. *See* ECF 22, at 2–3 ¶¶ 10–11. At that time, Plaintiff was working as a front-end cashier. ECF 86-2, at 2 ¶ 6. She was supervised by Jim Spradbrow, who had become the manager of the Germantown Shoppers in 2015. *Id.* at ¶ 7. Mr. Spradbrow remained Plaintiff's supervisor for the rest of her employment with Defendants. *Id.* In June 2016, Plaintiff developed a bladder injury that required her to take frequent bathroom breaks and limited her ability to lift heavy objects. *Id.* at 3–4 ¶¶ C, 13. Plaintiff requested and received accommodations from Defendants related to her bladder condition in 2016. *Id.* ¶¶ 13–18. Specifically, Plaintiff was "allowed to take frequent bathroom breaks" so long as she left "someone in [her] place" so that her station was not unattended. *Id.* at 4 ¶ 15 (alteration in original). In 2019, Plaintiff submitted an additional note from her doctor requesting that she be allowed to take bathroom breaks as needed. *Id.* ¶ 16.

According to Plaintiff, Mr. Spradbow "micromanaged" her, "yell[ed] at everyone," and criticized her at work. *Id.* at 6–7 ¶ 21. He "scrutinized her work," monitored the times she clocked in and out, reprimanded her for eating at her workstation, and, on at least two occasions, questioned her or complained about her breaks. *Id.* ¶¶ 21–22 ("Mr. Spradbrow would ask: 'How many breaks have you taken?'"); *id.* at 8 ¶ 26 ("Mr. Spradbrow screamed at her 'you took more than 2 breaks[.]'").

Plaintiff is Peruvian and speaks Spanish. ECF 86-2, at 1 ¶ 2; *see also* ECF 96-1, at 8, 26:7–11 (referencing Plaintiff's Spanish fluency in deposition). In 2018, Defendants asked Plaintiff to

"retrain on the Company's Courtesy Dignity and Respect Policy and watch a training video" that "discusses the policy and contains vignettes of situations that might arise in a retail store environment." ECF 86-2, at 5 ¶ 19. One of the vignettes in the video depicted two employees speaking Spanish in front of another employee who did not understand the language, showing the non-Spanish-speaking employee worrying that the Spanish-speaking employees were talking about him in a language he could not understand. *Id.* The video concluded by explaining, "Even though the checkers may have been more comfortable speaking their native tongue, they should have considered the feelings of their non-Spanish speaking coworkers," but also noted, "Our company values people of all backgrounds including those who speak more than one language. In fact, multilingual associates help us better serve our communities." *Id.* Plaintiff attested that Mr. Spradbrow told her not to speak Spanish at work and "didn't like it that [she and other coworkers] spoke Spanish." *Id.* at 6 ¶ 21.

On May 11, 2019, while Plaintiff was at Shoppers in her off-time completing her personal grocery shopping, an on-shift coworker reported her for misconduct. ECF 86-2, at 10 ¶ 35. According to the coworker, Plaintiff referred to him as a "maricon"—which translates to "faggot"[2] in English—while completing her shopping. *Id.* This coworker does not speak Spanish, but his report was corroborated by a written report from another coworker who observed the incident and speaks Spanish. *Id.* Defendants suspended Plaintiff without pay pending an investigation into the incident on that same day. *Id.* ¶ 36. Mr. Spradbrow testified that "[f]or basic things like time and attendance, job performance, being out of dress code, all of those kinda company policies," the

---

[2] The Court repeats the highly offensive slur only because it is necessary for the subsequent analysis. This word is a homophobic slur and has a long history of being accompanied by violence against those at whom it is leveled. Linton Weeks, *The Fa-Word: An Insulting Slur In the Spotlight*, NPR (May 11, 2011), https://www.npr.org/2011/05/28/136722113/the-fa-word-an-insulting-slur-in-the-spotlight [https://perma.cc/BVX2-3GJV].

normal disciplinary process would be "a counseling/verbal warning, . . . two written warnings, a three-day suspension, and then termination." ECF 96-6, at 24, 90:16–91:6. But for more "serious" incidents, "something like derogatory comments and things like that," it is within the discretion of the store manager to escalate the incident to Defendants' human resources department immediately for a suspension pending an investigation. *Id.* at 91:6–20.

On May 16, 2019, the Spanish-speaking coworker who submitted a written report related to the incident submitted a second report stating that Plaintiff had "attempted to get [her] to recant her statement." ECF 86-2, at 11 ¶ 39. On May 29, 2019, Plaintiff "submitted a disability claim to her union." *Id.* ¶ 40.

On May 30, 2019, Defendants sent a letter to Plaintiff regarding the incident and their investigation. ECF 86-2, at 11 ¶ 41. The letter stated that "other employees in the store are concerned about their safety and do not want to work with you." *Id.* In the letter, Defendants described the conversation between Plaintiff and the Spanish-speaking coworker as "threaten[ing]" and noted that Plaintiff had said that she was "suffer[ing] from depression" due to the stress of her work. ECF 91-3, at 1. The letter also offered Plaintiff the opportunity to return to work if she transferred to another store and signed a "last chance agreement stating that [she] must interact respectfully with coworkers and customers at all times." *Id.* Before Plaintiff could return to work, though, Defendants required that she

> provide documentation from a qualified health care provider certifying that [she was] able to return to work and perform the essential functions of [her] position either with or without a reasonable accommodation and certifying that [she did] not pose a direct threat to [her] own safety or the safety of coworkers or persons with whom [she came] in contact at work.

*Id.*

Plaintiff refused to sign the last chance agreement and refused transfer to another store, and so did not return to work. ECF 86-2, at 13 ¶ 46. On June 17, 2019, she requested to take extended leave "due to her serious health condition." *Id.* at 14 ¶ 48. Defendants granted Plaintiff's request for more than 18 months of leave. *Id.* ¶ 51. On November 22, 2021, Defendants sent Plaintiff a letter requesting an update on whether she intended to return to work. *Id.* ¶ 52. Plaintiff did not respond, and Defendants "assumed that she had abandoned her position" and terminated her. *Id.* at ¶¶ 52–56.

Plaintiff brings four claims against Defendants. ECF 22, at 5–7, ¶¶ 21–52. First, she alleges discrimination on the basis of her disabilities of Post Traumatic Stress Disorder ("PTSD") and "severe stress disorder" in violation of the ADA. *Id.* at 5 ¶¶ 21–30. Second, Plaintiff alleges that Defendants violated Title VII by discriminating against her on the basis of her national origin. *Id.* at 6 ¶¶ 31–38. Third, Plaintiff alleges that Defendants retaliated against her in violation of the ADA when she "requested a reasonable accommodation for her disability." *Id.* at 6–7 ¶¶ 39–44. Fourth and finally, Plaintiff alleges that Defendants discriminated against her on the basis of national origin in violation of 42 U.S.C. § 1981. *Id.* at 7 ¶¶ 45–52. Defendants argue that they are entitled to summary judgment on all counts. ECF 86.

## II.   **LEGAL STANDARD**

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

"Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine factual dispute exists." *Progressive Am. Ins. Co. v. Jireh House, Inc.*, 603 F. Supp. 3d 369, 373 (E.D. Va. 2022) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ." *Anderson*, 477 U.S. at 247–48 (emphasis in original).

The Court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor, *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam); *Scott v. Harris*, 550 U.S. 372, 378 (2007), and the Court "may not make credibility determinations or weigh the evidence," *Progressive Am. Ins. Co.*, 603 F. Supp. 3d at 373 (citing *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 213 (4th Cir. 2007)). For this reason, summary judgment ordinarily is inappropriate when there is conflicting evidence because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002).

At the same time, the Court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 2003)). "The existence of a mere scintilla of evidence in support of the nonmoving party as well as conclusory allegations or denials,

without more, are insufficient to withstand a summary judgment motion." *Progressive Am. Ins. Co.*, 603 F. Supp. 3d at 373 (citing *Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020)).

## III.   **ANALYSIS**

Defendants move for summary judgment on all counts, arguing that Plaintiff is not a qualified individual with a disability under the ADA and that she cannot show discriminatory animus; that she cannot prove a causal connection between her national origin and any adverse employment action; that she cannot show any causal relationship between her accommodations request and any adverse employment action; and that § 1981 does not allow for discrimination claims based on national origin, or, alternatively, that Plaintiff again failed to prove any causal link between her national origin and any adverse employment actions. ECF 86-1, at 12–34. The Court addresses each of these arguments in turn.

### A.   **Defendants are entitled to summary judgment on both of Plaintiff's ADA claims.**

The ADA prohibits employers from discriminating against otherwise "qualified individual[s] on the basis of disability." 42 U.S.C. § 12112(a)–(b). Among the forms of discrimination prohibited by the statute are (1) imposing an adverse action upon an employee due to their disability; (2) retaliating against an employee for engaging in protected activities related to disability discrimination; and (3) creating a hostile work environment. *See Israelitt v. Enter. Servs. LLC*, 78 F.4th 647, 653 (4th Cir. 2023) (recognizing each type of claim under the ADA). "When a plaintiff alleges that her employer unlawfully discriminated or retaliated against her in violation of the ADA, she can prove her claim through direct and indirect evidence. Otherwise, the plaintiff may proceed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)." *Laird v. Fairfax Cnty.*, 978 F.3d 887, 892 (4th Cir. 2020)

7

(citing *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 572, 577 (4th Cir. 2015)).  Under the *McDonnell Douglas* framework, the plaintiff first bears the burden to establish a prima facie case for their claim.  *Raytheon Co. v. Hernandez*, 540 U.S. 44, 49–50 (2003).  After the plaintiff establishes their prima facie case, the burden shifts to the defendant to rebut the inference of unlawful conduct by showing that there was a legitimate, non-discriminatory purpose for their actions.  *Id.*  The plaintiff, however, can still succeed on their claim if they are able to prove that the defendant's allegedly legitimate purpose is pretextual.  *Jacobs*, 780 F.3d at 575–76 (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)).

> 1.   <u>Defendants are entitled to summary judgment on count one because Plaintiff has failed to demonstrate any dispute of material fact as to whether she was a qualified individual with a disability as pled in her complaint.</u>

Count one suggests two forms of discrimination based on Plaintiff's disability: discrimination in the form of a hostile work environment and discrimination in the form of wrongful termination.  ECF 22, at 5 ¶ 26 ("Defendant[s] harassed and disparaged Plaintiff because of her disability.  Defendant[s] indefinitely suspended and/or terminated Plaintiff because of her disability.");  *see also* ECF 91, at 2–5 (arguing that Defendants engaged in both forms of discrimination).  To succeed on either theory of liability, Plaintiff must demonstrate that she is a "qualified individual" with a disability.  42 U.S.C. § 12112(a)–(b).

Under the ADA, a "disability" is defined as "a physical or mental impairment that substantially limits one or more major life activities," "a record of such an impairment," or "being regarded as having such an impairment."  42 U.S.C. § 12102(1).  A "qualified individual" is one who, "with or without reasonable accommodation, can perform the essential functions of the employment position that [the] individual holds or desires."  *Id.* § 12111(8).

Here, Plaintiff's complaint is clear that the disabilities she bases her claim of discrimination on are "severe stress disorder and Post Traumatic Stress Disorder."  ECF 22, at 5 ¶ 24.  Defendants'

motion for summary judgment convincingly argues that there is little evidence to support the assertion that Plaintiff was suffering from these disorders at the time she was suspended from employment with Defendants in May 2019, and that, moreover, Defendants were not aware of these conditions at all during the relevant timeframe, negating any inference discriminatory animus based on these disabilities. *See* ECF 86-1, at 13–19. The undisputed facts submitted by both parties note that Plaintiff "has never been diagnosed with PTSD" and that Plaintiff "was diagnosed with depression, anxiety, and bipolar disorder" after her suspension began and she ceased reporting to work. ECF 86-2, at 3 ¶¶ 10–11. The undisputed facts also demonstrate that Plaintiff's requests for accommodations at work related solely to her bladder condition. *Id.* at 3–4, ¶¶ 13–18.   In Plaintiff's opposition to Defendants' motion for summary judgment, however, she appears to completely abandon the argument that the alleged discrimination she faced at the hands of Defendants was based on her mental health problems, instead focusing solely on her bladder condition. *See* ECF 91, at 2–5 (making no mention at all of PTSD or stress disorder and resting her claim of disability discrimination solely on her bladder limitations).

Plaintiff cannot change the nature of her claim through an argument advanced for the first time in her opposition. Arguing that her claim really rests on her bladder injury rather than her mental health conditions at this late stage of the case is "an impermissible attempt to constructively amend the complaint" and unfairly prejudices Defendants by depriving them of the opportunity to conduct discovery based on Plaintiff's new theory of liability. *Harris v. Reston Hosp. Ctr., LLC,* 523 F. App'x 938, 946 (4th Cir. 2013). And this is not a case where prudent parties may have been on notice that Plaintiff would frame an argument around her bladder condition; the word "bladder" does not appear at all in Plaintiff's already-amended complaint. *See* ECF 22, at 1–8 (making no mention of Plaintiff's bladder condition and arguing that her disability came from

mental health conditions); *see also Hendrix v. Pactiv LLC*, 488 F. Supp. 3d 43, 52 (W.D.N.Y. 2020) (prohibiting plaintiff from proceeding in disability discrimination lawsuit on basis of being "legally blind" when his complaint and EEOC charge were based on a disability of "high blood pressure").

Plaintiff cannot move forward at the summary judgment stage on a theory of discrimination based on an entirely new disability, and her failure to dispute Defendant's arguments that she was not disabled under the ADA by reason of her mental health conditions during the relevant timeframe equates to waiver of that argument. *See Gowen v. Winfield*, Civ. No. 20-00247, 2022 WL 822172, at *3 (W.D. Va. Mar. 18, 2022) (noting the "[f]ailure to respond to an argument made in a dispositive pleading results in a concession of that claim" and collecting cases (citation omitted)); *Mentch v. E. Sav. Bank, FSB*, 949 F. Supp. 1236, 1246–47 (D. Md. 1997) (stating failure to meaningfully oppose or respond to an argument in a motion constitutes a waiver); *Prince v. Libr. Co. of Balt. Bar*, Civ. No. 23-00362, 2023 WL 3847430, at *6 (D. Md. June 6, 2023) (finding plaintiff conceded arguments by failing to respond to defendants' arguments). As such, summary judgment is granted for Defendants on count one.

      2.      Defendants are entitled to summary judgment on count three because Plaintiff has not carried her burden under the *McDonnell Douglas* burden-shifting framework.

Count three alleges that Defendants "retaliated against Plaintiff for engaging in the protected activity of requesting a reasonable accommodation by placing her on indefinite suspension and/or terminating her employment" because she "requested reasonable accommodations for her disability." ECF 22, at 6–7 ¶¶ 39–43. Though the complaint makes no mention of Plaintiff's bladder injury, the Court nonetheless reads this claim as being based upon Plaintiff's 2016 requests for accommodations in the form of (1) more frequent bathroom breaks; (2) restrictions on the amount of weight she would be required to lift; and (3) being moved to a

less demanding position (cashier instead of head clerk of a section of the store). *See* ECF 86-2, at 3–4 ¶¶ 13–15.

To succeed on a retaliation claim brought under the ADA, a plaintiff must show: "(1) she has engaged in protected conduct; (2) she suffered an adverse action after engaging in the protected conduct; and (3) there was a causal link between the protected conduct and the adverse action." *Laird*, 978 F.3d at 892 n.4 (quoting *Laber v. Harvey*, 438 F.3d 404, 432 (4th Cir. 2006)).

"[P]rotected activity includes opposing any act or practice by the employer that violates the ADA and pursuing rights guaranteed by the statute[.]" *LeBarron v. Interstate Grp., LLC*, 529 F. Supp. 3d 1163, 1173 (D. Nev. 2021) (citing *Pardi v. Kaiser Found. Hosps.*, 389 F.3d 840, 850 (9th Cir. 2004)).   Requesting a reasonable accommodation for one's disability is a protected activity. *See Smith v. CSRA*, 12 F.4th 396, 416 (4th Cir. 2021) (finding that there was "no dispute" that the plaintiff had shown that she had engaged in a protected activity in the form of requesting an accommodation). An adverse employment action is one that adversely "affect[ed] employment or alter[ed] the conditions of the workplace." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 62 (2006).   Termination is a quintessential adverse employment action. 42 U.S.C. § 12112(a) (prohibiting discrimination against qualified individuals on the basis of disability in certain employment actions, including the "discharge" of employees); *see also Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011) (citing "firing" as an example of an adverse action).   Thus, Plaintiff here has shown that she engaged in a protected activity through requesting accommodations relating to her bladder condition and that she suffered an adverse action in 2019 when she was suspended and again in 2021 when she was terminated. *See* ECF 86-2, at 3–4 ¶¶ 13–18, 10 ¶ 36, 14 ¶¶ 52, 56. The success of this claim, then, hinges on the question of causation.

Often, plaintiffs point to a temporal connection to support an inference of a causal link between their protected activity and an adverse action, with shorter time periods giving rise to a stronger inference. *See Wilson v. City of Gaithersburg*, 121 F. Supp. 3d 478, 485–86 (D. Md. 2015) (citing *Clark Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268, 273 (2001)) (collecting cases about temporal proximity between protected activity and adverse action). A plaintiff may also point to "the intervening period for other evidence of retaliatory animus" to "establish causation." *Lettieri v. Equant Inc.,* 478 F.3d 640, 650 (4th Cir. 2007).

As in her argument relating to count one, Plaintiff here again raises a new factual basis for causation in in her opposition that was not stated in her complaint. *See* ECF 91, at 5–6; ECF 22, at 6–7 ¶¶ 39–44. The complaint asserts that Plaintiff was retaliated against for requesting accommodations for her disability, ECF 22, at 7 ¶ 43, but her opposition now alleges that she was retaliated against because she "filed formal complaints against her supervisor" for disability-based discrimination, ECF 91, at 6. As explained above, such dramatic changes in Plaintiff's claims raised for the first time in opposition to Defendant's motion for summary judgment are not permitted. Plaintiff's claim must, at this point, proceed on the basis for liability for which she provided notice to Defendants: retaliation for her request for reasonable accommodations. ECF 22, at 6–7 ¶¶ 39–44.

Plaintiff's initial requests for accommodations were submitted and granted in 2016, and she was not suspended until 2019. ECF 86-2, at 3–4 ¶¶ 13–15, 10 ¶ 36. This is much too long a time period to support an inference of causation. *See Wilson*, 121 F. Supp. 3d at 485–86 (citing *Clark Cnty. Sch. Dist.,* 532 U.S. at 273) (collecting cases about temporal relationship between protected activity and adverse action).

12

There is, however, evidence that Plaintiff submitted an additional, if duplicative, request for accommodations in late March 2019, less than two months before her suspension. The undisputed facts state that Plaintiff provided Defendants with a note from her doctor on March 22, 2019, that explained that Plaintiff "ha[d] an overactive bladder and ha[d] to go every 1–2 hrs to the restroom" and requested that Defendants "[p]lease accommodate her in every way possible." ECF 86-2, at 4 ¶ 16. It is unclear if this was accompanied by a formal request for accommodations or how this requested accommodation would differ from the procedure that was already in place, whereby Plaintiff could take several additional bathroom breaks per day as long as someone covered her station while she used the restroom. *Id.* ¶ 15. Still, this request, whatever its nature, came less than two months before Plaintiff was suspended on May 11, 2019. *Id.* at 10 ¶ 36. Taking all inferences in favor of Plaintiff, this timing could give rise to an inference of causation. *See Carter v. Ball*, 33 F.3d 450, 460 (4th Cir. 1994) ("This court found a causal connection between a plaintiff's protected activity and her discharge where the employer, with knowledge of a pending discrimination complaint, fired plaintiff approximately four months after the complaint was filed.").

The timing of the protected activity with respect to the employment consequences is not the only way Plaintiff may support her position; she may also point to "the intervening period for other evidence of retaliatory animus" to "establish causation." *Lettieri*, 478 F.3d at 650. Here, Plaintiff points to two instances where Mr. Spradbrow allegedly made comments expressing frustration towards her accommodations and specifically criticized the number of bathroom breaks she took.[3] In early 2018, "Mr. Spradbrow screamed at her 'you took more than 2 breaks,'" ECF

---

[3] Though Plaintiff identifies other slights she experienced at the hands of Mr. Spradbrow, these additional allegations do not reference Plaintiff's disability or her accommodations. *See* ECF 86-2, at 6 ¶ 21, 8 ¶ 26.

86-2, at 8 ¶ 26, and, more generally, Mr. Spradbrow often asked her "How many breaks have you taken?" during the relevant time period, *id.* at 6 ¶ 21. The 2018 incident occurred more than a year before Plaintiff suffered the first adverse action complained of, greatly diminishing any inference that the potential animus displayed in Mr. Spradbrow's singular comment motivated Plaintiff's later suspension. *See Clark Cnty. Sch. Dist.*, 532 U.S. at 273–74 (explaining that temporal proximity must be "very close" to infer causation, and that a gap of 20 months "suggests, by itself, no causality at all"). Mr. Spradbrow's repeated questioning of Plaintiff's bathroom break status, though, seems to have been ongoing throughout the time period at issue. *See* ECF 86-2, at 6 ¶ 21 (stating that "Mr Spradbrow would [] ask: 'How many breaks have you taken?'" suggesting that this was an ongoing practice). While this piece of evidence, on its own, could certainly be interpreted as an innocent inquiry, the Court must take all inferences in favor of Plaintiff at this stage. *See Tolan*, 572 U.S. at 657. The timing of Plaintiff's 2019 request for additional accommodations and her subsequent suspension combined with her supervisor's fixation on her bathroom breaks give rise to an inference of causation.

The inquiry does not end here, however. After a plaintiff proves a prima facie case of retaliation, "[t]he burden then shifts [back] to the [employer] to show that its purportedly retaliatory action was in fact the result of a legitimate non-retaliatory reason." *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015). Defendants here identify a legitimate reason for Plaintiff's suspension: she leveled an offensive slur towards another employee. *See* ECF 86-1, at 20; ECF 86-2, at 10 ¶¶ 35–36; *see, e.g., Grant v. ISEC, Inc.*, Civ. No. RDB-08-2791, 2010 WL 1569856, at *5 (D. Md. Apr. 19, 2010) (finding that using "vulgar and inappropriate language" towards a coworker was a legitimate, non-discriminatory reason for termination), *aff'd*, 396 F. App'x 941 (4th Cir. 2010); *Taylor v. Cnty. of Pulaski*, Civ. No. 06-00467, 2008 WL 4533977, at

14

*3 (W.D. Va. Oct. 8, 2008) (finding that using "abusive language" towards coworkers was a legitimate, non-discriminatory reason for suspension).

The burden next shifts back to Plaintiff to demonstrate that Defendants' allegedly legitimate reason was pretextual. *Foster*, 787 F.3d at 250. Beyond the alleged harassment she experienced from Mr. Spradbrow, Plaintiff points to two additional acts to show pretext: (1) Defendants did not follow proper procedure in suspending her, and (2) Defendants requested that she provide a doctor's note before she returned to work. ECF 91, at 6. With respect to Plaintiff's first piece of evidence, Defendant has provided evidence that it is standard practice to escalate directly to a suspension pending investigation when an employee uses a slur, and Plaintiff has provided no evidence to the contrary. *See* ECF 96-6, at 24, 90:16–91:20 (explaining that for serious incidents like theft or making derogatory comments to a coworker, it is within the store manager's discretion to bring the issue straight to human resources for suspension without verbal or written warnings).

With regard to the request for a note from a medical provider stating that Plaintiff was not a threat to herself or others, the context of the letter requesting the doctor's note is illuminating. The note stated that other employees were "concerned about their safety" and did not want to work with Plaintiff. ECF 91-3, at 1. Plus, Plaintiff's coworkers had accused her of directing a slur often associated with violence against a particular minority group toward a coworker, and Plaintiff later attempted to cajole another coworker into recanting her report regarding the use of the slur. *See id.* This is more than enough support for the argument that asking Plaintiff to verify that she would not be a threat to herself or others upon her return to work is a legitimate inquiry. Furthermore, the day before Defendants sent the letter offering reinstatement and requesting a doctor's note, Plaintiff had reported to her union that she was disabled and could no longer work. ECF 86-2, at

11 ¶ 40. Defendants' request for her to verify that she could work (and making allowance for reasonable accommodations for her to do so) in this context is logical and not indicative of pretext. Finally, Defendants' request for a mental health practitioner to opine that Plaintiff is not a threat bears no logical relationship to Plaintiff's former request for accommodations related to her bladder injury. Plaintiff has not met her burden under the *McDonnell Douglas* framework.

As such, Defendants have demonstrated that they had a legitimate, non-discriminatory purpose in suspending and terminating Plaintiff, and Plaintiff has failed to raise any genuine dispute of material fact showing that their reason was pretextual. Defendants are entitled to summary judgment on count three.

### B.   Defendants are entitled to summary judgment on count two because Plaintiff fails to make a prima facie case of discrimination based on national origin.

Title VII of the Civil Rights Act prohibits status-based discrimination based on an employee's personal characteristics such as "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2 (a); *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 346–47 (2013); *Strothers v. City of Laurel*, 895 F.3d 317, 326–27 (4th Cir. 2018). "A plaintiff pursuing a claim under Title VII may either offer direct evidence of discrimination or, using indirect evidence, she may rely on the burden shifting framework that was adopted by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)." *Coleman v. Whitley*, Civ. No. 21-1181, 2022 WL 16630570, *1 (4th Cir. Nov. 2, 2022). "Pursuant to the *McDonnell Douglas* standard, the plaintiff bears the initial burden of establishing by a preponderance of the evidence a prima facie case of discrimination." *Conway v. Kijakazi*, Civ. No. 21-00502, 2023 WL 5153641, at *5 (D. Md. Aug. 10, 2023) (citing *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 252–53 (1981)).

When a plaintiff is terminated due to misconduct or due to poor work performance, the plaintiff might allege either a discriminatory discharge claim, a discriminatory enforcement claim,

or both. *Tims v. Carolinas Healthcare Sys.*, 983 F. Supp. 2d 675 (W.D.N.C. 2013) (discussing both discriminatory discharge and enforcement claims); *Moore v. Penfed Title, LLC*, Civ. No. 20-CV-0867, 2021 WL 2004785, at *10 (E.D. Va. May 18, 2021) ("Discriminatory termination and discriminatory enforcement of employee disciplinary measures are separate causes of action."); *Jones v. Southcorr, L.L.C.*, 324 F. Supp. 2d 765, 776 n.11 (M.D.N.C. 2004) (noting that the "elements of [these] prima facie cases are different" and thus analyzing them separately in deciding a motion for summary judgment), *aff'd sub nom. Jones v. Southcorr, LLC*, 117 F. App'x 291 (4th Cir. 2004). Here, Plaintiff bases her claim of Title VII discrimination on both theories of discrimination. *See* ECF 22, at 6 ¶ 34 ("Defendant discriminated against Plaintiff by treating her disparately because of her national origin in reprimands for conduct and work conditions and by placing her on indefinite suspension and/or terminating her employment.").

Under either type of claim, the only direct evidence of discrimination that Plaintiff provides to support her Title VII discrimination claim is that she and other Spanish-speaking employees were told not to speak Spanish at work and were shown a video that cautioned them not to speak Spanish at work. ECF 91, at 6–7 (citing ECF 86-2, at 5–7 ¶¶ 19–21). This is not sufficient. As a preliminary matter, Plaintiff bases her discrimination claim on national origin (Peruvian), and there are both people of Peruvian descent who do not speak Spanish and people of other national origins who do speak Spanish. Setting this aside—and assuming *aguendo* that English-only language policies could be taken as a proxy to target people of specific national origins—the fact that Defendants had in place and enforced a policy that employees should refrain from speaking another language at work is not, on its own, sufficient to create an inference of discrimination.[4] *Long v.*

---

[4] While this Court has previously found that a language policy that is enforced only against Spanish speakers while allowing other non-English languages to be spoken at work can be evidence of discrimination, Plaintiff has identified no such evidence in this case. *See* ECF 91, at 6–7 (claiming

*First Union Corp. ofVa.*, 894 F. Supp. 933, 941 (E.D. Va. 1995), *aff'd*, 86 F.3d 1151 (4th Cir. 1996) ("Title VII does not protect an individual's ability to express their cultural heritage while at the workplace by speaking in their native tongue."). This is particularly true where, as here, there is a legitimate business reason for the policy, as evidenced by Defendants' training video. *Id.* (finding that seeking "to prevent the employees from intentionally using their fluency in Spanish to isolate and to intimidate members of other ethnic groups" was a legitimate business purpose for implementing English-only policy); ECF 86-2, at 5 ¶ 19 (displaying text of training video which explained that the feelings of monolingual coworkers may be hurt when others speak Spanish around them, leading to workplace discord). As such, the mere fact that Defendants prohibited employees, including Plaintiff, from speaking Spanish at work is not enough direct evidence to support a claim of discrimination under Title VII.

Because Plaintiff does not present sufficient direct evidence to survive summary judgment, she must proceed under the *McDonnell Douglas* burden-shifting framework. In a discriminatory enforcement context, a plaintiff establishing a prima facie claim of discrimination under *McDonnell Douglas* must demonstrate: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), *aff'd*, 566 U.S. 30 (2012); *Matias v. Elon Univ.*, 780 F. App'x 28, 31 (4th Cir. 2019); *Rayyan v. Va. Dep't of Transp.*, 719 F. App'x 198, 203 (4th Cir. 2018); *Spriggs v. Pub. Serv. Comm'n of Md.*, 197 F. Supp. 2d 388, 392 (D. Md. 2002). On the other hand, a prima facie case

---

only that employees were told not to speak Spanish but making no mention of policy's impact on other languages); *see also Lopez v. BMA Corp.*, Civ. No. DKC-13-2406, 2013 WL 6844361, at *9 n.7 (D. Md. Dec. 24, 2013) ("Defendant's characterization of its alleged policy as "English-only" is incorrect. It is better characterized as a 'no-Spanish' policy as Plaintiff alleges that Bangladeshi employees were free to speak in their native language.").

of discriminatory discharge requires that the plaintiff show "(1) she is a member of a protected class; (2) she was qualified for her job and her job performance was satisfactory; (3) she was fired; and (4) other employees who are not members of the protected class were retained under apparently similar circumstances." *Hughes v. Bedsole*, 48 F.3d 1376, 1383 (4th Cir. 1995).

It is undisputed that Plaintiff is a member of a protected class (Peruvian and Hispanic) and that she suffered adverse actions in the form of suspension and termination. ECF 86-2, at 1 ¶ 2 (acknowledging that Plaintiff "is Peruvian"): *Hispanic Origin*, CDC: National Center for Health Statistics (Aug. 12, 2022), https://www.cdc.gov/nchs/hus/sources-definitions/hispanic-origin.htm [https://perma.cc/5EP6-ZWAC] ("Hispanic or Latino origin includes people of Mexican, Puerto Rican, Cuban, Central and South American, Dominican, and other or unknown Latin American or Spanish origin."). Plaintiff also attested that she was reprimanded more than her colleagues and that she and her other Spanish-speaking colleagues were repeatedly told not to·speak Spanish in the workplace. ECF 86-2, at 5–7 ¶¶ 19–22. Even if Plaintiff were able to show a genuine dispute of material fact with respect to whether her job performance was satisfactory, she identifies no comparators either with respect to how often she was reprimanded or with respect to her ultimate suspension and termination.[5] *See* ECF 91, at 1–7 (identifying no comparators). The joint statement of facts, however, contains a list of other employees that Defendants claim were subject to similar disciplinary measures as Plaintiff. ECF 86-2, at 13 ¶ 47. While Plaintiff argues that Defendant

---

[5] Plaintiff could have also established a prima facie case of discrimination by pointing to "evidence of a general pattern of racial discrimination in the employment practices of the defendant." *Moore v. City of Charlotte*, 754 F.2d 1100, 1105 (4th Cir. 1985) (citing *Reynolds v. Abbeville County School District No. 60*, 554 F.2d 638, 642 (4th Cir.1977)). The only evidence Plaintiff offers to this effect, though, is the existence and enforcement of the policy that required employees to speak English at work, which, as explained above, is insufficient on its own to raise an inference of discrimination. *See* ECF 91, at 7.

19

failed to provide sufficient information to prove that these other employees are fair comparators of Plaintiff, ECF 91, at 4, it is *Plaintiff's* burden to identify comparators who were similarly situated to Plaintiff and yet received different treatment to Plaintiff to state a prima facie case for discrimination under either a discriminatory enforcement or a discriminatory discharge theory. *Coleman,* 626 F.3d at 190–91; *Hughes,* 48 F.3d at 1383. Plaintiff has failed to do so. As such, Plaintiff fails to make a prima facie case for discrimination under Title VII, and Defendant is entitled to summary judgment on this claim.

**C.    Defendants are entitled to summary judgment on count four because Plaintiff again fails to meet her burden under the *McDonnell Douglas* framework.**

The Supreme Court has explained that § 1981 was "meant, by its broad terms, to proscribe discrimination in the making or enforcement of contracts [including employment contracts] against, or in favor of, any race." *Gratz v. Bollinger,* 539 U.S. 244, 275–76 n.23 (2003) (quoting *McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273, 295–96 (1976)). The *McDonnell Douglas* analysis used in Title VII claims applies equally to claims based on § 1981. *Anderson v. Westinghouse Savannah River Co.,* 406 F.3d 248, 268 (4th Cir. 2005) (applying burden-shifting framework simultaneously to discrimination claims brought under Title VII and § 1981).

The parties agree that "[c]laims based on Section 1981 [should] not [be] based on National Origin, but race." ECF 91, at 6; *see also* ECF 86-1, at 32. It is correct that "§ 1981 does not provide protection for individuals discriminated against on the basis of national origin." *Duane v. Gov't Emps. Ins. Co.,* 784 F. Supp. 1209, 1216 (D. Md. 1992), *aff'd sub nom. Duane v. GEICO,* 37 F.3d 1036 (4th Cir. 1994) (citing *Saint Francis Coll. v. Al-Khazraji,* 481 U.S. 604, 613 (1987)). Still, this Court has, at least once, generously considered a claim wherein the plaintiff labeled the claim as being based on national origin, but clearly referenced discrimination based on ethnicity

in the recitation of the claim.[6] *Lander v. Westat, Inc.*, Civ. No. AW-05-290, 2005 WL 1116386, at *3 (D. Md. May 11, 2005) (finding fair notice for ethnicity-based discrimination claim when the complaint included the sentence, "As a Spanish–American (Hispanic) male, [the plaintiff] is in a class of persons protected by Title VII and 24 U.S.C. § 1981"). Here, in the amended complaint, Plaintiff labeled her § 1981 claim as based on national origin but included in her statement of that claim that she "is Hispanic and a member of a protected class," arguably providing notice to Defendants of a claim based on ethnicity. ECF 22, at 7 ¶ 47. But even if this Court were to construe Plaintiff's § 1981 claim as one based on ethnicity, Plaintiff's § 1981 claim must fail for the same reasons her Title VII claim fails, as it would proceed under the same *McDonnell Douglas* analysis outlined above. *Gairola v. Com. of Va. Dep't of Gen. Servs.*, 753 F.2d 1281, 1285 (4th Cir. 1985) ("Under Title VII and either § 1981 or § 1983, the elements of the required prima facie case are the same."). As such, Defendants are entitled to summary judgment on count four.

## IV. <u>CONCLUSION</u>

For the foregoing reasons, Defendant's motion for summary judgment, ECF 86, is **GRANTED**.

A separate implementing Order will issue.

Dated: <u>July 15, 2024</u>                                    <u>/s/</u>
                                                                      Brendan A. Hurson
                                                                      United States District Judge

---

[6] The Supreme Court has "extend[ed] the protections of § 1981 beyond technically racial discrimination to include ethnicity." *Duane v. Gov't Emps. Ins. Co.*, 784 F. Supp. at 1217 (citing *Al-Khazraji*, 481 U.S. at 613). "In the eyes of the Census Bureau, . . . "Hispanic" is an ethnicity and not a race." Mark Hugo Lopez et al., *Who is Hispanic?*, Pew Research Center (Sept. 5, 2023), https://www.pewresearch.org/short-reads/2023/09/05/who-is-hispanic/ [https://perma.cc/TGJ5-TYZ4].